UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

FILE NO.

|  |  |
|---|---|
| CHIQUITA KELLY,<br><br>               Plaintiff,<br><br>  v.<br><br>UNION MEMORIAL REGIONAL<br>MEDICAL CENTER, INC. d/b/a ATRIUM<br>HEALTH MONROE and THE<br>CHARLOTTE-MECKLENBURG<br>HOSPITAL AUTHORITY d/b/a ATRIUM<br>HEALTH,<br><br>               Defendants. | **COMPLAINT**<br>(Jury Trial Demanded) |

COMES NOW the Plaintiff, CHIQUITA KELLY (hereinafter "Plaintiff"), by and through her undersigned attorney, hereby files this Complaint for damages and other legal and equitable relief from Defendants, UNION MEMORIAL REGIONAL MEDICAL CENTER, INC. d/b/a Atrium Health Monroe and THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY d/b/a Atrium Health (hereinafter "Defendants") for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.*

### NATURE OF THE CASE

1.  This is an action brought by Plaintiff seeking damages from Defendants for acts of discrimination. Defendants' acts of discrimination are in violation of Title VII, and any other causes of action that can be inferred from the facts set forth herein.

2.  Plaintiff was employed by Defendants at 600 Hospital Drive, Monroe, NC 28112. Throughout Plaintiff's employment with Defendants, Plaintiff has been subjected to

discrimination and retaliation based on race, in violation of Title VII and other applicable statutes.

## JURISDICTION & VENUE

3.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; 42 U.S.C. §§ 2000e *et seq.,* as amended, and (iii) 42 U.S.C. §§ 1981 *et seq.,* as amended.

4.  In addition to the above referenced federal claims, this complaint all asserts claims arising under the laws of the State of North Carolina, specifically intentional infliction of emotional distress and negligent infliction of emotional distress. The state law claims are sufficiently related to the federal claim such that the Court may exercise supplemental jurisdiction over them, as provided for under 28 U.S.C. § 1367. The state law claims arise out of the same common nucleus of operative facts as the federal claim, and they form part of the same case or controversy under Article III of the United States Constitution. No exceptional circumstances exist that would justify declining the exercise of supplemental jurisdiction over the state law claims.

5.  Venue is proper in this Court in as much as the unlawful employment practices occurred in this judicial district. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), (c), and (d), in that Defendants maintains offices and conducts business in this district.

**PARTIES**

6. Plaintiff is a person who has been aggrieved by Defendants' actions. She is, and has been, at all relevant times, a resident of North Carolina.

7. At all relevant times, Plaintiff was an African American female employee of Defendants and therefore covered by Title VII.

8. Upon information and belief, Defendant UNION MEMORIAL REGIONAL MEDICAL CENTER, INC. is organized by City Charter under § 160A of the North Carolina General Statutes with its principal office and place of business in Monroe, Union County, North Carolina, where it maintains and administers a Hospital which employs Plaintiff.

9. Upon information and belief, Defendant THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY is organized by City Charter under § 160A of the North Carolina General Statutes with its principal office and place of business in Charlotte, Mecklenburg County, North Carolina, where it maintains and administers a Hospital which employs Plaintiff.

10. Defendants transact and continue to transact business in North Carolina by, among other things, employing persons at 600 Hospital Dr, Monroe, NC 28112 located within North Carolina and within this judicial district.

11. At all times material to this lawsuit all defendants were alter egos of one another.

12. In the alternative to the extent that the corporate defendants/owners are found to be separate corporate entities the Defendants each remain liable for the acts and omissions of each other because the corporate Defendants engaged in a joint venture and enterprise to act in concert in the operation, management, and maintenance of the relevant hospital

3

home. Moreover, the corporate Defendants agreed to a common purpose of operating, managing, and maintaining the relevant Hospital.

13. At all times herein mentioned, Defendants were an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 USC § 2000e *et seq* having fifteen (15) or more employees, and as such was prohibited from retaliating against an employee for complaining of racial and disability discrimination and retaliation.

14. To the extent it is applicable, Defendants has adopted a plan of insurance pursuant to N.C.G.S. § 160A-485 and has waived its immunity from civil liability.

**EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES**

15. Plaintiff, who has herein alleged claims pursuant to Title VII, has timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

16. On January 31, 2024, Plaintiff received her Notice of Right to Sue from the EEOC.

**STATEMENT OF FACTS**

17. Plaintiff is an African American female.

18. Plaintiff commenced employment as a Temporary Registered Nurse Floater for Defendants located at 600 Hospital Dr, Monroe, NC 28112, in or around September 12, 2022 ("Monroe location").

19. Plaintiff was employed pursuant to an initial agreement (hereinafter "Plaintiff's Contract"), whereby Plaintiff would be employed for 13 weeks (September 12, 2022 through December 17, 2022) at the Monroe location.

20. Plaintiff's hourly rate for the agreement was $90.00.

21. At all relevant times, Defendants employed a Charge Nurse named Shannon Jamison (hereinafter "Ms. Jamison").

22. At all relevant times, Defendants employed a Charge Nurse named Brittany Crawford (hereinafter "Ms. Crawford").

23. At all relevant times, Defendants employed an African American member of Teammate Relations named Kenya Willis (hereinafter "Ms. Willis").

24. At all relevant times, Defendants employed a Charge Nurse named Hannah, that was Ms. Jamison's niece (hereinafter "Hannah").

25. At all relevant times, Defendants employed a Nurse Manager named Tiffany Burton (hereinafter "Ms. Burton").

26. Upon information and belief, at all relevant times, Defendants employed a Charge Nurse named Juanita Thompson (hereinafter "Ms. Thompson").

27. Ms. Jamison was once employed by Defendants as a Manager for the unit that Plaintiff worked in and held far reaching influence.

28. Ms. Jamison, Ms. Crawford, Hannah, Ms. Burton, and Ms. Thompson are all Caucasian.

29. Plaintiff reported directly to Ms. Burton.

30. Ms. Jamison began bullying Plaintiff during the second week of Plaintiff's Contract.

31. Ms. Jamison consistently expressed negative opinions about fellow employees to Plaintiff and would frequently walk away when Plaintiff stated/reiterated her stance against speaking negatively about others.

32. Ms. Jamison consistently responded to Plaintiff's requests for assistance with a dismissive or uncooperative attitude, which created a recurring pattern of difficulty when seeking help from her.

33. Ms. Jamison has used extremely argumentative and intimidating tones when communicating with Plaintiff.

5

34. Ms. Jamison consistently "stared Plaintiff down" to intimidate her.

35. Upon information and belief, Ms. Jamison intentionally and maliciously moved/ misplaced Plaintiff's belongings to harass her and cause her hardship.

36. Upon information and belief, Ms. Jamison expressly influenced other Caucasian nurses to be dismissive and isolate Plaintiff.

37. Plaintiff informed Ms. Jamison that she felt isolated and that she believed that her Caucasian colleagues treated her differently because of Ms. Jamison.

38. Plaintiff complained to Ms. Jamison and told her that she felt that Ms. Jamison's actions were racist.

39. In response to this complaint, Ms. Jamison admitted to Plaintiff that she told Ms. Thompson about the about Plaintiff's sentiments regarding what she perceived as racist treatment.

40. Thereafter Ms. Thompson began to exhibit hostile treatment towards Plaintiff, which included bullying.

41. Ms. Jamison and other nurses had intentional conversations in front of Plaintiff openly discussing how they "get Travel Nurses kicked out of the unit."

42. Hannah informed Plaintiff that the permanent nurses stick together and often share the same disdain about co-workers that they do not like.

43. Ms. Crawford made indirect threats to Plaintiff by stating that she can make things very hostile for her.

44. Ms. Crawford told Plaintiff that she and Ms. Jamison "built the unit up to what it is today" and that "certain people" don't deserve to be on it.

6

45. Upon information and belief, Ms. Jamison was referring to African American people when she referenced "certain people."

46. Defendants fostered an environment that was not inclusive to African American Nurses.

47. Upon information and belief, and at all relevant times herein, Defendants did not employ any African American Nurses on a permanent basis at the Monroe location.

48. Plaintiff had apprehensions about reporting Ms. Jamison's harassment because she feared retaliation.

49. Plaintiff had apprehensions about reporting Ms. Crawford's harassment because she feared retaliation.

50. On or about October 14, 2022, Plaintiff sent an email to Ms. Burton attempting to complain about: a hostile work environment; operational errors; and patient safety issues that she had to remedy.

51. Ms. Burton acknowledged that she did receive the email and had meant to call Plaintiff, however, failed to do so.

52. Upon information and belief, Ms. Burton intentionally ignored this email.

53. On or about November 24, 2022, Defendants offered Plaintiff a subsequent contract for 13 weeks (December 18, 2022 through April 1, 2022) at a reduced rate of $80 per hour at the same Monroe location.

54. Defendants' offer of the reduced rate was a demotion, despite her satisfactory performance and the fact that she met Defendants' reasonable expectations.

55. On or about December 2, 2022, Plaintiff made a complaint to HR about harassment and hostile work environment that Plaintiff has been subjected to.

56. Plaintiff then had a verbal conversation with Ms. Willis, whereby Plaintiff specifically mentioned that she believed that she was subjected to racial discrimination.

57. Plaintiff further explained that she felt she was being discriminated against because of disparate and hostile treatment described herein. Notably, Plaintiff was the only African American working on night shift.

58. Plaintiff further explained that she felt she was not getting the assistance she needed when requested and was not being given fair and equal assignments compared to her Caucasian co-workers. Specifically, Plaintiff consistently found herself assigned patients with the most complex and challenging issues; a workload disproportionately heavier than that of her Caucasian colleagues.

59. Ms. Willis abruptly ended the meeting, advising that she could not continue the conversation and that she would follow up the next day.

60. On or about December 4, 2022, Plaintiff sent a follow up email to Ms. Burton informing her that she filed an internal complaint stemming from the harassment that experienced from Ms. Jamison.

61. On or about December 5, 2022, Defendants' human resource department (hereinafter "HR") officially took Plaintiff's statement for her complaint.

62. On or about December 6, 2022, Ms. Burton informed Plaintiff that she would have Plaintiff moved to another facility rather than investigating Plaintiff's complaints.

63. On or about December 7, 2022, HR informed Ms. Burton that Plaintiff's case would be closed out and that it would not be investigated.

64. Plaintiff informed Ms. Burton that her desire was to remain at the same location if the bullying and harassment would cease.

8

65. Prior to Plaintiff's complaints, she was never reassigned to a different location.

66. After Plaintiff's complaints, Plaintiff was reassigned multiple times.

67. On December 13, 2022, Plaintiff was scheduled to begin her shift at 6:45 p.m., however, she was informed at 5:45 p.m. that she would be reassigned to another one of Defendants' hospital location. Notably, she was informed that she was not needed at the new location one (1) hour prior to the beginning of her shift.

68. The Defendants' purported attempt to schedule the Plaintiff on December 13, 2022, appears to have been a disingenuous ploy aimed at relocating the Plaintiff from the Monroe location, ostensibly to evade addressing issues of racism, and to retaliate against the Plaintiff for bringing forward complaints of racism.

69. Defendants' policy states that any staff member needed at another location should be contacted two (2) hours prior to the start of their shift and that floaters are required to be paid if they are sent home.

70. The Plaintiff was notified less than two hours before the shift began, a clear violation of the Defendants' own policy regarding notification procedures.

71. Plaintiff was never paid for her services the days that she was reassigned.

72. Thereafter, Plaintiff was sent to a location 50 minutes away from her normal place of employment.

73. Plaintiff was not informed of her reassignment two hours prior to the start of her shift.

74. Upon information and belief, this was done to cause undue hardship to Plaintiff.

75. Upon information and belief, while Defendants retained the right to transfer travel nurses at any time, it was customary at the Monroe location for nurses to remain assigned until the end of their contract period without reassignment.

9

76. Upon information and belief, Caucasian Nurses were not subjected to any of the hardships, disparities, hostilities that Plaintiff had to endure.

77. Plaintiff has at all times relevant had the skills, experience, and education for the position of Temporary Registered Nurse.

78. At all relevant times throughout her employment, Plaintiff has satisfactorily performed her job.

79. Plaintiff has endured significant emotional distress due to the Defendants' failure to prevent harassment, retaliation, or a hostile work environment.

80. Plaintiff was diagnosed with depression and situational anxiety stemming from her workplace.

81. Plaintiff terminated her contract on December 15, 2022, due to the harassment, hostile work environment, and/or discriminatory treatment that she was subjected to during her tenure with Defendants.

82. Per *Chisholm v. United States Postal Serv.*, "[a]n administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." 665 F.2d 482, 491 (4th Cir. 1981).

83. Moreover, as long as a "plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in her subsequent civil suit." *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000).

84. Plaintiff filed an EEOC Charge of Discrimination dated April 3, 2023, alleging discrimination based on race, and retaliation.

85. Defendants submitted a position statement on July 17, 2023, whereby Defendants responded to the allegations set forth in the Charge of Discrimination.

86. Defendants' position statement addresses several issues including, but not limited to: (1) Plaintiff's Contract and renewal contract; (2) Plaintiff's complaints to Ms. Jamison about race, harassment, bullying, etc.; (3) Plaintiff's complaints to Ms. Burton that went unaddressed; (4) Plaintiff's complaint's to teammate relations; (5) Defendants' decision to reassign Plaintiff to another location despite the lack of necessity for her services; and (6) Plaintiff's resignation.

87. Plaintiff then submitted a rebuttal on August 30, 2023, which addressed several issues including but not limited to: (1) Plaintiff's complaints to Ms. Jamison about race, harassment, bullying, etc.; (2) Plaintiff's complaints to Ms. Willis about racial discrimination; (3) Plaintiff's complaints to Ms. Burton that went unaddressed; (4) Defendants' decision to reassign Plaintiff to another location despite the lack of necessity for her services; and (5) Defendants' failure to pay Plaintiff for the days that she was improperly reassigned.

88. The EEOC then conducted their investigation and issued a right to sue dated January 31, 2024.

## FIRST CLAIM FOR RELIEF
### Race Discrimination in Violation of Title VII

89. Plaintiff incorporates the foregoing paragraphs by reference herein.

90. When addressing race-discrimination claims under 42 U.S.C.S. § 1981, courts apply the burden-shifting framework established in First, the plaintiff must establish a prima facie

case for race discrimination by showing (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 699 (4th Cir. 2023)

91. As an African American, Plaintiff is a member of a protected class.

92. At all relevant times throughout her employment, Plaintiff has satisfactorily performed her job at a level that met her employer's legitimate expectations.

93. Plaintiff was subjected to adverse action when she was offered a renewal contract with a lower hourly rate.

94. Plaintiff was also subjected to adverse action when she was improperly re-assigned and not paid.

95. Plaintiff was treated less favorably than her Caucasian counterparts. More specifically, Plaintiff experienced racial discrimination as her Caucasian colleagues were not reassigned without pay.

96. Upon information and belief, Plaintiff experienced racial discrimination as her Caucasian colleagues were not offered a renewal contract at lower rates.

97. Plaintiff suffered a hostile work environment when she was subjected to a hostile work environment based on her race.

98. Defendants' adverse action would have dissuaded a reasonable person from making a charge of discrimination.

99. Plaintiff would not have been subjected to an adverse action but for her race.

100. The adverse action taken against Plaintiff was motivated by her race.

101. Defendants' actions as described herein were willful and wanton and done with reckless disregard for Plaintiff's protected rights.

102. As a proximate result of the above-described discrimination, Plaintiff sustained damages including back pay, compensatory damages including emotional distress, and has incurred attorney's fees and costs.

**SECOND CLAIM FOR RELIEF**
**Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.***
*(Retaliation)*

103. Plaintiff incorporates the foregoing paragraphs by reference herein.

104. To state a prima facie claim of retaliation under Title VII, a plaintiff must establish (1) engagement in a protected activity; (2) a materially adverse action; and (3) a causal connection between the protected activity and the asserted materially adverse action. *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018)

105. In the context of a retaliation claim, a "protected activity" is an employee's participation in an ongoing investigation or proceeding under Title VII, or an employee's opposition to discriminatory practices in the workplace. *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 259 (4th Cir. 1998); 42 U.S.C.A. § 2000e-3(a).

106. For the second element, the "'materially adverse action' standard is explicitly less restrictive than the 'adverse employment action' standard for discrimination claims" because while "'adverse employment actions' in the discrimination context must 'affect employment or alter the conditions of the workplace,' a 'materially adverse action' in the retaliation context need not impact conditions in the workplace to be actionable. Rather, a materially adverse action is one that "well might . . . dissuade[ ] a reasonable worker

13

from making or supporting a charge of discrimination." *New v. Thermo Fisher Sci., Inc.,* 2022 U.S. Dist. LEXIS 45910.

107. Plaintiff engaged in protected activity by making multiple good faith complaints of race discrimination.

108. Plaintiff engaged in protected activity by making multiple good faith complaints of race-based harassment.

109. Plaintiff was treated less favorably than her counterparts who did not engage in protected activity.

110. Upon information and belief, the adverse action taken against Plaintiff was motivated by her race.

111. Plaintiff was subjected to adverse action when she was offered a renewal contract with a lower hourly rate.

112. Plaintiff was subjected to adverse action when Defendants falsely informed Plaintiff that her services were needed at another location, which caused Plaintiff to be removed from the schedule with no pay.

113. Upon information and belief, Defendants' actions were based on Plaintiff's race.

114. Defendants' actions as described herein were willful and wanton and done with reckless disregard for Plaintiff's protected rights.

115. Upon information and belief, as set forth above, Defendants targeted Plaintiff for retaliatory discipline, in the form of a decreased hourly pay rate, because she complained about disparate treatment stemming from her race.

14

116. Upon information and belief, as set forth above, Defendants targeted Plaintiff for retaliatory discipline, in the form of a reassignment, because she complained about disparate treatment stemming from her race.

117. As a result of this race-based and targeted retaliation, Plaintiff was constructively discharged.

118. During her employment, Plaintiff was subjected to adverse actions, including but not limited to: (1) harassment; (2) constructive discharge; (3) a decreased pay rate; (4) non-payment of wages; and (5) a hostile work environment.

119. These materially adverse actions described above are sufficient to dissuade a reasonable worker from making or supporting a charge of discrimination.

119. Upon information and belief, no other Caucasian employees have been reassigned for complaining about race.

120. Upon information and belief, no other Caucasian employees have been renewed at a lower rate for complaining about race.

120. Defendants' conduct, as described above, was without justification or excuse; is reprehensible; and occurred despite Plaintiff's complaints to prevent, halt, and reverse the discrimination and retaliation.

121. There is a causal connection between the protected activity and the asserted materially adverse action because Plaintiff experienced a hostile work environment, a lower contract renewal rate, or reassigned within weeks of complaining about race discrimination.

123. The conduct alleged herein violates Section 704 of Title VII of the Civil Rights Act of 1964, amended, 42 U.S.C §§ 2000e *et seq.*

124. Defendants' unlawful employment practices complained of above were intentional.

15

125. The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Plaintiff.

126. Defendants' actions were materially adverse and would dissuade a reasonable employee from making a charge of discrimination.

122. As a proximate result of the above-described discrimination, Plaintiff sustained damages including back pay, compensatory damages including emotional distress, and has incurred attorney's fees and costs.

**THIRD CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1981**
***(Hostile Work Environment)***

123. Plaintiff re-alleges and re-incorporates the above paragraphs as if fully stated forth herein.

124. A hostile work environment claim may be brought under 42 U.S.C. 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts [. . .] as is enjoyed by white citizens." *See Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369 (2004).

125. The elements for a claim of hostile work environment are the same under § 1981 as they are under Title VII. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001).

126. Further, disparate treatment claims may be brought under § 1981, and the elements of a prima facie case of disparate treatment under § 1981 are the same as those for a Title VII claim. *See Gairola v. Virginia Dep't of General Services*, 753 F.2d 1281 (4th Cir. 1985).

127. As an African American, Plaintiff belongs to a statutorily protected category.

128. Plaintiff, was qualified for her job, as evidenced by her contract renewal with Defendants. Additionally, Plaintiff, in all respects, was performing her job in a manner that was consistent with Defendants' legitimate business expectations.

16

129. Defendants discriminated against Plaintiff as previously described herein including but not limited to subjecting Plaintiff to: (1) harassment; (2) constructive discharge; (3) a decreased pay rate; (4) non-payment of wages; and (5) a hostile work environment.

130. Ms. Jamison fostered a hostile work environment when she initiated bullying towards Plaintiff in the second week of her contract, consistently expressing negative opinions about colleagues and walking away when the Plaintiff objected to such behavior.

131. Ms. Jamison further fostered a hostile work environment when she responded dismissively to Plaintiff's requests for assistance, contributing to ongoing difficulty in seeking help.

132. Ms. Jamison further engaged in argumentative and intimidating communication, including staring down the Plaintiff, and intentionally moving or misplacing her belongings to harass her.

133. Upon information and belief, Ms. Jamison also influenced other Caucasian nurses to adopt dismissive and isolating behavior towards the Plaintiff.

134. Ms. Jamison did not communicate with Plaintiff's Caucasian co-workers in an intimidating or argumentative tone.

135. Ms. Jamison's extremely argumentative and intimidating tone coupled with her position of power with Defendants has created a hostile work environment whereby Plaintiff continued employment under continuous fear of harassment.

136. Plaintiff was harassed and discriminated against due to her race.

137. But for Plaintiff's status as an African American woman, she would not have suffered a legally protected right.

17

138. This harassment ultimately altered the conditions of Plaintiff's employment, as Plaintiff was given a contract renewal at a lower rate.

139. These actions were taken with willful and wanton disregard of Plaintiff's rights under § 1981.

140. The stress endured by Plaintiff was so severe that a reasonable man could not be expected to endure it.

141. As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, compensatory damages, and other damages to be determined at a trial of this matter.

**FOURTH CLAIM FOR RELIEF**
**(Constructive Discharge)**

142. Plaintiff incorporates the foregoing paragraphs by reference herein.

143. To establish a hostile-environment constructive discharge claim, a plaintiff must show the requirements of both a hostile work environment and a constructive discharge claim. *Sunkins v. Hampton Rds. Connector Partners*, No. 2:23cv91, 2023 U.S. Dist. LEXIS 202262, at *17 (E.D. Va. Nov. 9, 2023).

144. This Court's standard for constructive discharge once required a showing that the "employer deliberately made the working conditions intolerable in an effort to induce the employee to quit." *Chapman v. Oakland Living Ctr., Inc.,* 48 F.4th 222, 235 (4th Cir. 2022). Under that standard, the plaintiff had to "allege and prove two elements: (1) the deliberateness of [the employer's] actions, motivated by racial bias, and (2) the objective intolerability of the working conditions." *Id.* Critically, however, "as a result of intervening Supreme Court case law, 'deliberateness' is no longer a component of a constructive discharge claim." *Id.* That is, "[t]he Supreme Court now has clearly

18

articulated the standard for constructive discharge, requiring objective intolerability circumstances of discrimination so intolerable that a reasonable person would resign but not deliberateness, or a subjective intent to force a resignation."

145. As an African American, Plaintiff belongs to a statutorily protected category.

146. Plaintiff, was qualified for her job, as evidenced by her contract renewal with Defendants. Additionally, Plaintiff, in all respects, was performing her job in a manner that was consistent with Defendants' legitimate business expectations.

147. Defendants discriminated against Plaintiff as previously described herein including but not limited to subjecting Plaintiff to: (1) harassment; (2) constructive discharge; (3) a decreased pay rate; (4) non-payment of wages; and (5) a hostile work environment.

148. Ms. Jamison fostered a hostile work environment when she initiated bullying towards Plaintiff in the second week of her contract, consistently expressing negative opinions about colleagues and walking away when the Plaintiff objected to such behavior.

149. Ms. Jamison further fostered a hostile work environment when she responded dismissively to Plaintiff's requests for assistance, contributing to ongoing difficulty in seeking help.

150. Ms. Jamison further engaged in argumentative and intimidating communication, including staring down the Plaintiff, and intentionally moving or misplacing her belongings to harass her.

151. Upon information and belief, Ms. Jamison also influenced other nurses to adopt dismissive and isolating behavior towards the Plaintiff.

152. Ms. Jamison did not communicate with Plaintiff's Caucasian co-workers in an intimidating or argumentative tone.

19

153. Ms. Jamison's extremely argumentative and intimidating tone coupled with her position of power with Defendants has created a hostile work environment whereby Plaintiff continued employment under continuous fear of harassment.

154. Plaintiff was harassed and discriminated against due to her race.

155. But for Plaintiff's status as an African American woman, she would not have suffered a legally protected right.

156. This harassment ultimately altered the conditions of Plaintiff's employment, as Plaintiff was given a contract renewal at a lower rate.

157. Plaintiff ultimately quit due to the hostile conditions set forth by Defendants.

158. These actions were taken with willful and wanton disregard of Plaintiff's rights under § 1981.

159. The stress endured by Plaintiff was so severe that a reasonable man could not be expected to endure it.

160. As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, compensatory damages, and other damages to be determined at a trial of this matter.

### SIXTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

161. Plaintiff re-alleges and re-incorporates the above paragraphs as if fully stated forth herein.

162. To state a claim for intentional infliction of emotional distress, plaintiff must allege facts sufficient to show the following three elements: (1) extreme and outrageous conduct, (2) which is intended to cause or with reckless indifference to the likelihood that they will cause, (3) severe emotional distress to another. *Dickens v. Puryear*, 302 N.C. 437, 453 (1981).

20

163. Ms. Jamison's acts of discrimination, including but not limited to, engaging in argumentative and intimidating communication, including staring down Plaintiff, and intentionally moving or misplacing her belongings to harass her, coupled with her hostile tone with Plaintiff on multiple occasions were extreme and outrageous.

164. Ms. Jamison performed this conduct with intent to cause or with reckless indifference to the likelihood that it would cause Plaintiff's severe emotional distress, as evidenced by Ms. Jamison's continued hostility of Plaintiff, influence on other employees to be hostile towards Plaintiff, and conduct effecting Plaintiff's employment and livelihood.

165. Ms. Jamison's extremely argumentative and intimidating tone coupled with her position of power with Defendants has created a hostile work environment whereby Plaintiff continued employment under continuous fear of harassment, stress, and retaliation.

166. Plaintiff suffered severe emotional distress and mental anguish as result of the hostile work environment and adverse employment actions.

167. Plaintiff was diagnosed with depression and situational anxiety stemming from her workplace.

168. The stress endured by Plaintiff was so severe that a reasonable man could not be expected to endure it.

169. At all relevant times, Ms. Jamison was acting within the scope of her employment. Thus, Defendants is vicariously liable under the doctrine of *respondeat superior*.

170. As a direct and proximate result of the conduct described herein, Plaintiff has suffered and is entitled to recovery of damages to be determined at a trial of this matter.

<u>**SEVENTH CAUSE OF ACTION**</u>
**(Negligent Infliction of Emotional Distress)**

Case 3:24-cv-00403   Document 1   Filed 04/21/24   Page 21 of 25

171. Plaintiff re-alleges and re-incorporates the above paragraphs as if fully stated forth herein.

172. Under North Carolina state law, a cause of action for negligent infliction of emotional distress is established when the Defendants negligently engaged in conduct in which it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress, and the conduct did in fact cause the plaintiff severe emotional distress. *Sorrells v. M.Y.B. Hospitality Ventures of Asheville*, 334 N.C. 669, 435 S.E.2d 320 (1993) (citing *Johnson v. Ruark Obstetrics and Gynecology Assocs.*, 327 N.C. 283, 395 S.E.2d 85 (1990)).

173. Defendants had a duty to exercise reasonable care to avoid cause emotional distress to Plaintiff.

174. Defendants' blatant disregard for Plaintiff's complaints and failure to investigate the complaints as alleged hereinabove breached her duty of care owed to Plaintiff.

175. Ms. Jamison's hostile behavior as described above, coupled with Defendants' inaction and failure to investigate has created a hostile work environment whereby Plaintiff continued employment under continuous fear of harassment and retaliation.

176. Defendants could reasonably foresee that their conduct, including but not limited to, continuous acts of hostility towards Plaintiff would lead to emotional distress.

177. Plaintiff suffered severe emotional distress as result of Defendants' actions.

178. Plaintiff was diagnosed with depression and situational anxiety stemming from her workplace.

179. The stress endured by Plaintiff was so severe that a reasonable man could not be expected to endure it.

180. At all relevant times, Ms. Jamison was acting within the scope of her employment. Thus, Defendants his vicariously liable under the doctrine of *respondeat superior*.

181. As a direct and proximate result of the conduct described herein, Plaintiff has suffered and is entitled to recovery of damages to be determined at a trial of this matter.

## DAMAGES

182. As a result of the aforementioned conduct, Plaintiff has sustained permanent injury to her reputation; economic injuries; emotional and mental injuries; violation of her integrity; loss of valuable time; embarrassment, humiliation, compensatory damages; punitive damages; and all other injuries set forth above.

WHEREFORE, Plaintiff, Chiquita Kelly, respectfully requests prays:

183. That the Court empanel a jury to hear her cause;

184. A judgment declaring that the practices complained of herein are unlawful and in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.;*

185. Actual compensatory damages pursuant to 42 U.S.C. § 12117, including but not limited to, lost wages, lost job benefits, physical and mental suffering, in an amount undetermined, but believed to be in excess of $75,000.00;

186. Costs, disbursements, and attorneys' fees pursuant to 42 U.S.C. § 12117;

187. All damages which Plaintiff has sustained because of Defendants' conduct, including back pay, benefits, general and specific damages for lost compensation, and job benefits she would have received but for Defendants' retaliatory practices, and for emotional distress, humiliation, embarrassment, and anguish;

188. Exemplary and punitive damages in an amount commensurate with Defendants' ability and to deter future malicious, reckless, and/or intentional conduct;

189. Awarding Plaintiff the costs and disbursements incurred in connection with this action, including reasonable attorney's fees, expert witness fees and other costs;

190. Pre-judgment and post-judgment interest, as provided by law;

191. That the Court retain jurisdiction over Defendants until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law; and

192. Granting Plaintiff other and further relief as this Court finds necessary and proper.

193. Plaintiff also seeks injunctive relief, including, but not limited to:

    a. Training regarding the prohibition against retaliation for engaging in protected activity for all of Defendants' supervisors;

    b. Training regarding the prohibition against discrimination for engaging in protected activity for all of Defendants' supervisors;

    c. Training of all employees regarding retaliation, including the reporting procedures for reporting such retaliation, conducted by reputable outside vendors;

    d. Supervisory discipline up to and including termination for any employee who engages in discrimination based upon disability, including any employee who engages in retaliatory practices; and

    e. Monitoring by the Court or a federal agency to ensure that Defendants complies with all injunctive relief.

24

194. Plaintiff further demands that she be awarded such other and further legal and equitable

relief as may be found appropriate and as the Court may deem just or equitable.

This the 21st day of April, 2024.

*/s/ M. Anthony Burts II*
M. Anthony Burts II
Attorney for Plaintiffs
N.C. State Bar No.: 49878
PO Box 102
Newton, NC 28658
Telephone: (704) 751-0455
Fax: (704) 413-3822
anthony@burtslaw.com